IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| MOHAMMAD REZA VAGHARI | : | NO.  08-693-01 |
| a/k/a "Mitch Vaghari" | : | |
| MIR HOSSEIN GHAEMI | : | -02 |

DuBOIS, J.                                                                                              AUGUST 5, 2009

**M E M O R A N D U M**

I.   **INTRODUCTION**

On November 13, 2008, the government filed a six-count Indictment against defendants Mohammad Reza Vaghari and Mir Hossein Ghaemi.  Vaghari is named in all six counts of the Indictment; Ghaemi is named in Count One.  The Indictment charges defendants with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1705 *et seq.*, in violation of 18 U.S.C. § 371 (Count One); three substantive counts of violating IEEPA, in violation of, *inter alia*, 50 U.S.C. §§ 1701 *et seq.*, and aiding and abetting, in violation of 18 U.S.C. § 2 (Counts Two, Three and Four); naturalization fraud, in violation of 18 U.S.C. § 1425 (Count Five); and possession of immigration documents procured by fraud, in violation of 18 U.S.C. § 1546(a) (Count Six).  In particular, the government alleges that "[d]efendants together conducted business under the name Saamen Company , LLC ('Saamen'), . . . through which the defendants conspired to export goods, technology, and services from the United States for ultimate delivery to Iran . . . ."  (Indict. ¶ 3.)

Presently before the Court is Defendant Mohammad Reza Vaghari's Motion to Suppress

Documents and Other Evidence Seized by the FBI from His Residence.[1]  In the Motion, defendant moves to suppress:  (1) all documentary and other evidence seized by the FBI pursuant to warrantless searches of his residence at any time prior to October 28, 2005; (2) all documentary and other evidence seized from his residence by the FBI without a warrant or consent on October 28, 2005; (3) all documentary and other evidence seized by the FBI from his residence on December 13, 2005 pursuant to a search warrant that was based, in significant part, on information obtained from items seized unlawfully on October 28, 2005; and (4) all additional evidence that is the fruit of the documents and other information seized by the FBI on October 28, 2005 and December 13, 2005.  The Court held a hearing and oral argument on defendant's Motion to Suppress on July 23, 2009.  For the reasons set forth below, defendant's Motion to Suppress is denied.

## II.     BACKGROUND

On October 28, 2005, Federal Bureau of Investigation ("FBI") Agent Andrew Pelczar, III, and Sergeant Detective Gregory Seltzer, a Delaware County sergeant detailed to work with the FBI, went to defendant's apartment.  (Suppression Hr'g Tr. 55, 64, 143, July 23, 2009.) Defendant is an Iranian citizen with legal permanent resident status.  (Id. at 67–68.)  The visit was prompted by a complaint received by Sergeant Seltzer from a vendor at Beckman-Coulter, a nationwide manufacturer and distributor of medical equipment.  (Id. at 55.)  In July 2005, Sergeant Seltzer contacted Agent Pelczar about the complaint.  (Id.)  Agent Pelczar subsequently spoke with the Beckman-Coulter vendor, who stated that he had been contacted by defendant

---

[1] Defendant Ghaemi did not join defendant Vaghari's Motion to Suppress.  Accordingly, for the purposes of this Memorandum, the Court will use the term "defendant" to refer to defendant Vaghari only.

regarding the purchase of a $100,000 centrifuge. (Id. at 56–57.) The vendor thought that the inquiry was "suspicious" because defendant contacted him only by cell phone, used a Yahoo email account, and initially refused to identify the end user of the centrifuge. (Id. at 57.) Defendant also asked to have the centrifuge delivered to his apartment and was planning to pay for it in cash. (Id. at 57, 64.) The vendor stated that his research revealed additional details that caused him to worry that defendant was planning to ship the centrifuge overseas. (Id. at 57–58.) Moreover, according to the vendor, defendant did not request a warranty or installation, which were included in the $100,000 purchase price. (Id. at 63–64.) Defendant never actually purchased this centrifuge. (Id. at 113.)

At the time of the search in question, Agent Pelczar worked on the Joint Terrorism Task Force; this work involved many investigations of Iranians. (Id. at 54.) Prior to becoming an FBI agent, Agent Pelczar worked for the Defense Intelligence Agency in the counter-terrorism division and the Middle Eastern Military Regional Assessments Division. (Id. at 51–52.) As part of his duties at the Defense Intelligence Agency, he focused on issues involving Iran. (Id. at 54.) Before this work, Agent Pelczar had enlisted in the Army and had attended the Defense Language Institutes for a one-year course in Farsi, the language spoken in Iran. (Id. at 52.)

Agent Pelczar and Sergeant Seltzer went to defendant's apartment on Friday, October 28, 2005, in the early afternoon, dressed "casually." (Id. at 64–65.) According to Agent Pelczar, this was the first time that he or any other agent, to his knowledge, visited defendant's apartment. (Id. at 129–30.) Before knocking on defendant's door, they noticed that his apartment, B-105, was below ground and accessed by stairs from the parking lot. (Id. at 65.) The centrifuge in question weighed approximately 1,000 pounds and would be difficult to deliver to a below-ground apartment. (Id. at 65–66.) Agent Pelczar and Sergeant Seltzer then knocked on

defendant's door, introduced themselves, and told him that they had some questions about his business. (Id. at 66.) They showed defendant identification but did not display their weapons at any time. (Id.) According to Agent Pelczar, defendant was "extremely cordial" and ushered them into his apartment. (Id.)

Defendant invited the officers to sit in the living room (Id.) First, the officers asked for identification; defendant retrieved his green card and his driver's license and provided them to the officers. (Id. at 67.) He told the officers that he had entered the United States unlawfully but that he had since lawfully obtained permanent resident status and a green card. (Id.) The officers then asked defendant questions about his work; according to Agent Pelczar, the conversation flowed fairly freely, and defendant was friendly, not uncomfortable or hesitant. (Id. at 67–68.) Agent Pelczar also asked to see defendant's passport; defendant went unaccompanied down a hallway and returned with four passports—a valid Iranian passport and three expired Iranian passports. (Id. at 68–69.) Agent Pelczar asked if he could take the passports and return them to defendant at a later time; according to Agent Pelczar, defendant agreed. (Id. at 69, 71.)

In response to the officers' questions about his work, defendant told them that his company, Saamen, Inc., exported items such as computers and vitamin supplements to the United Arab Emirates. (Id. at 69–70.) Again, defendant went unaccompanied down the hallway and returned with one or two documents describing shipments to the United Arab Emirates. (Id. at 70.) Agent Pelczar testified that defendant volunteered to retrieve the documents and assented when Agent Pelczar asked if he could take them. (Id. at 70–71.) According to Agent Pelczar, the entire conversation was "extremely friendly and professional." (Id. at 71.)

Agent Pelczar testified further that defendant gave permission when they asked if they could look around his apartment and "gave [them] a tour of his apartment." (Id.) In the

4

bedroom, the officers observed "dozens" of orange-colored bottles containing prescription medications.  (Id. at 72.)  Agent Pelczar thought this was "strange" because defendant did not appear to have any physical or mental infirmities, and he was concerned that defendant could be shipping prescription medications to the United Arab Emirates.  (Id. at 72–73, 140.)  Defendant explained that the prescription medications were to treat injuries resulting from an automobile accident.  (Id. at 74.)  Nevertheless, according to Agent Pelczar, when the officers asked if they could take the medications, defendant agreed.  (Id.)  Agent Pelczar testified further that Sergeant Seltzer asked defendant whether he needed the medications, defendant indicated that there were some that he did not need, and the officers took a sample of the medications but not all of them.  (Id.)  Defendant provided the officers with a bag for the medications.  (Id. at 75.)  Sergeant Seltzer also noticed a roll of labels that said "Maximan" and appeared to be for a "male enhancement vitamin."  (Id.)  Defendant also gave the officers permission to take the roll of labels.  (Id.)  According to Agent Pelczar, defendant's tone remained friendly throughout.  (Id.)

Defendant next led the officers into a second bedroom that he was using as a home office, which, according to Agent Pelczar, was not neatly organized.  (Id. at 76, 133.)  Agent Pelczar observed "shipping documents, receipts, documents with Farsi writing on them and what appeared to be materials relating to [defendant's] export business."  (Id. at 76.)  After obtaining permission from defendant, Agent Pelczar used a sweeping motion to gather "a random sampling" of documents off of the top of defendant's desk.  (Id. at 77.)  The documents had dates ranging from 1996 to 2005.  (Id. at 129.)  Agent Pelczar testified that all of the documents were found on the top of defendant's desk and that he did not pull documents out of any files.  (Id. at 128–29.)  According to Agent Pelczar, defendant did not ask to copy any of the documents that were being taken by the officers.  (Id. at 80.)  The officers then left defendant's apartment, and

Sergeant Seltzer left defendant his business card. (Id. at 78–79.) The officers' visit lasted approximately thirty minutes in total—twenty minutes conversing in the living room and ten minutes touring the rest of the apartment. (Id. at 69.)

The officers took handwritten notes during their conversation with defendant. (Id. at 107; Notes of Agent Pelczar & Sergeant Seltzer, Oct. 28, 2005, Ex. D6.) These notes do not mention the seizures of defendant's property and do not contain any reference to defendant's consent to the search or the seizures. (Suppression Hr'g Tr. 119–20, 133–34.) In explanation, Agent Pelczar testified that he and Sergeant Seltzer took notes only during their conversation with defendant and not during the tour of defendant's apartment. (Id.) Agent Pelczar also did not include the seizures in the FBI Form 302 memorializing the interview completed on November 1, 2005. (Id. at 120–21; FBI Form 302, Nov. 1, 2005, Ex. D7.) Two days later, on November 3, 2005, Agent Pelczar completed another FBI 302 Form detailing the medications seized from defendant; it also listed four Iranian passports and "miscellaneous documents." (Suppression Hr'g Tr. 135–36; FBI Form 302, Nov. 3, 2005, Ex. D8.) That Form 302 stated that defendant "gave consent to search his apartment, as well as permission for the interviewing officials to remove certain items." (FBI Form 302, Ex. D8.)

According to Sergeant Seltzer, defendant clearly consented to the officers taking items from his apartment. (Id. at 151.) The officers, however, never informed defendant of his right to refuse to give consent. (Id. at 117–18, 138.) Moreover, Agent Pelczar did not present defendant with an FBI Consent to Search Form, which advises individuals of their right to refuse consent. (Id. at 116–17; Dep't of Justice, Federal Bureau of Investigation, Consent to Search, Ex. D3.) According to Agent Pelczar, he did not have any copies of the form with him on October 28, 2005, and he did not execute a hand-written version of the form. (Suppression Hr'g Tr. 116–17.)

Agent Pelczar testified that it did not enter his mind to have defendant complete such a form because he "was extraordinarily pleasant" and it "was a very, very friendly interview." (Id. at 117, 136–38.) The officers also did not give defendant a property receipt delineating the items that they were taking from his apartment on October 28, 2005. (Id. at 126.)

The following Monday, November 1, 2005, Sergeant Seltzer received a telephone call from an attorney representing defendant, Terri Pawelski, Esquire. (Id. at 143.) According to Sergeant Seltzer, Pawelski wanted to know the status of the case and if the officers were finished with the items that they had taken from the apartment. (Id. at 143, 148–49; FBI Form 302, Nov. 10, 2005, Ex. D9.) He advised her to contact Agent Pelczar for that information. (Suppression Hr'g Tr. 144, 149; FBI Form 302, Ex. D9.) According to Sergeant Seltzer, he also told Pawelski that "the search was completely voluntary and she said that she was aware of that and it was not an issue." (Suppression Hr'g Tr. 144; FBI Form 302, Ex. D9.)

Pawelski testified to the contrary. She stated that she called Sergeant Seltzer to get back defendant's seizure medication. (Suppression Hr'g Tr. 159.) When Sergeant Seltzer said that the items were taken by consent, according to Pawelski, she said that consent "was not the issue" and "was not even . . . on the table, at that point"; instead, she was only interested in getting defendant's medications returned. (Id. at 159.) She testified that she never said to Sergeant Seltzer that she understood that defendant had given consent. (Id. at 159–60.)

The same day, November 1, 2005, Sergeant Seltzer notified Agent Pelczar of the telephone call from Pawelski and the contents of the conversation. (Id. at 81, 144.) Pawelski called Agent Pelczar the next day, November 2, 2005, to, according to Pawelski, seek the return of defendant's seizure medication. (Id. at 95, 162–63; FBI Form 302, Nov. 2, 2005, Ex. D2.) Sergeant Seltzer did not complete an FBI Form 302 documenting the November 1, 2005

7

telephone conversation with Pawelski until November 10, 2005.  (Suppression Hr'g Tr. 145–47; FBI Form 302, Ex. D9.)

Pawelski testified that she called Agent Pelczar on multiple occasions to request the return of defendant's seizure medications.  (Suppression Hr'g Tr. 163.)  On November 23, 2005, the officers returned six written prescriptions to defendant's counsel.  (Id. at 93, 111–112; United States Dep't of Justice, Federal Bureau of Investigation, Receipt for Property Received/Returned/Released/Seized, Nov. 23, 2005, Ex. D1.)  At some point, the officers also returned defendant's current passport.  (Suppression Hr'g Tr. 112–13.)

Following the October 28, 2005 visit to defendant's apartment and further investigation, Agent Pelczar sought and obtained a search warrant for defendant's apartment.  (Id. at 82.)  The warrant was executed on December 13, 2005.  (Id. at 84.)  During the execution of the warrant, defendant handed Agent Pelczar a cellular telephone and said that Pawelski wished to speak with him.  (Id. at 85.)  According to Agent Pelczar, Pawelski said that "she was concerned that we obtained a search warrant to search [defendant's] apartment and that all we had to do was ask and they would have provided whatever we wanted."  (Id.)  Pawelski testified to the contrary, stating that she "never said [they] would have given him anything . . . that [he] wanted."  (Id. at 165.)  According to Pawelski, she said to Agent Pelczar that she "wish[ed] [he] had given her a heads up.  Maybe [they] could have worked something out."  (Id.)

### III.  LEGAL STANDARD

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable."  United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).  The applicable burden is proof by a preponderance of the

evidence.  United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967) (internal citations omitted); accord Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (citation omitted)).  One exception to the warrant requirement, however, is a search or seizure conducted pursuant to voluntary consent.  See Schneckloth v. Bustamante, 412 U.S. 218, 219 (1973).  For consent to be voluntary, it cannot be "the product of duress or coercion, express or implied . . . ."  Id. at 227.  The government has "the burden of proving that the consent was, in fact, freely and voluntarily given.  This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543, 548–49 (1968) (internal citations omitted).

To determine whether consent was given voluntarily, a court examines the totality of the circumstances.  United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009).  The Price court elaborated as follows:

> Both "the characteristics of the accused and the details of the interrogation" are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should "turn[] on the presence or absence of a single controlling criterion."  Factors to consider include:  the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment.  We have further identified as relevant "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions."

Id. (internal citations omitted).  "[W]hether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion."  United States v. Kim,

9

27 F.3d 947, 955 (3d Cir. 1994).

## IV. DISCUSSION

In the Motion to Suppress, defendant challenges the seizure of items from his apartment on October 28, 2005.[2] He concedes that he voluntarily consented to the officers' request to look around his apartment. (Def.'s Mot. 4; Def.'s Post-Hearing Mem. 9 n.7.) He argues, however, that he did not consent—or, in the alternative, that he consented only involuntarily—to the officers' seizure of his passports, his medication and prescriptions, and his documents. Both Agent Pelczar and Sergeant Seltzer testified that defendant consented to their requests to take his passports, his medications, and his documents. (Suppression Hr'g Tr. 69–71, 75, 77, 151.) This testimony is uncontroverted. Accordingly, the Court finds that defendant did in fact consent to the seizures. Whether defendant's consent was given voluntarily, however, must be determined from an examination of the totality of the circumstances.

### A. Knowledge of Right to Refuse Consent

Defendant argues that "[i]t is axiomatic that consent to a warrantless search or seizure is not voluntary unless the subject is informed of his right to refuse." (Def.'s Post-Hearing Mem. 2.) In particular, defendant contends that the lack of a written consent form and the lack of an instruction that defendant could refuse consent, without more, rendered defendant's consent involuntary. This is an incorrect understanding of the governing law. Both the Supreme Court and the Third Circuit have held that for a search or seizure to be consensual, an individual need

---

[2] Defendant also seeks to suppress all documentary and other evidence seized by the FBI pursuant to warrantless searches of his residence at any time prior to October 28, 2005. There is no evidence that any FBI or other agent was in defendant's apartment prior to October 28, 2005. Agent Pelczar testified that he was not in defendant's apartment at any time before October 28, 2005; neither, to his knowledge, was any other federal or state agent. (Suppression Hr'g Tr. 129–30.) Accordingly, the Court denies this portion of defendant's Motion to Suppress.

not be advised of his right to refuse consent. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994).

"While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." Schneckloth, 412 U.S. at 227. The Schneckloth Court explicitly rejected requiring Miranda-like warnings before a consent search. 412 U.S. at 231 ("One alternative that would go far toward proving that the subject of a search did know he had a right to refuse consent would be to advise him of that right before eliciting his consent. That, however, is a suggestion that has been almost universally repudiated by both federal and state courts, and, we think, rightly so." (internal citations omitted)). Rather than being dispositive, the failure to advise an individual of his right to refuse consent is instead only one factor to consider in the totality-of-the-circumstances analysis. See Kim, 27 F.3d at 955. Moreover, the lack of a written consent form, without more, does not render a search or seizure nonconsensual. United States v. Price, 558 F.3d 270, 279 (3d Cir. 2009).

Uncontroverted testimony at the suppression hearing establishes that the officers never informed defendant of his right to refuse to give consent. (Suppression Hr'g Tr. 117–18, 138, 149.) Moreover, Agent Pelczar did not present defendant with an FBI Consent to Search Form, which advises individuals of their right to refuse consent. (Id. at 116–17.) The aforementioned authority makes clear, however, that this alone did not vitiate the voluntariness of defendant's consent. The fact that defendant was not informed of his right to refuse consent is instead a factor to be weighed when examining the totality of the circumstances to determine whether defendant's consent was voluntary.

### B.     Totality of the Circumstances

In assessing whether consent was voluntary given the totality of the circumstances, factors to consider include: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; . . . the use of physical punishment[;] the setting in which the consent was obtained[; and] the parties' verbal and non-verbal actions." Price, 558 F.3d at 278 (internal quotation marks & citations omitted).  While this case presents some facts which call the voluntariness of defendant's consent into question, reviewing all of the facts together, the Court concludes that defendant's consent was voluntary.

Weighing in favor of concluding that defendant's consent was voluntary is the following: First, defendant is forty-one years old and has attended at least some college courses in business management. (FBI Form 302, Nov. 1, 2005, Ex. D7.) Moreover, he is of at least average intelligence, demonstrated by his founding and running of an export company, Saamen, Inc. (Id.) Although he is an Iranian citizen, he comprehends and speaks English proficiently; he does not require an interpreter to understand and participate in legal proceedings in this case. There is no evidence suggesting that defendant's consent was the result of a misunderstanding occasioned by a language barrier. Second, the officers were in defendant's apartment for approximately thirty minutes, a relatively short period of time. (Suppression Hr'g Tr. 69.) Third, the atmosphere of the interaction between defendant and the officers was not coercive. According to Agent Pelczar, the tone of the conversation was "extremely friendly and professional." (Id. at 70.) Agent Pelczar testified that when he told defendant that they wanted to ask some questions about his work, defendant was cordial and friendly. (Id. at 66.) Moreover, according to Agent Pelczar, defendant seemed comfortable during their conversation and responded to questions candidly.

12

(Id. at 67–68.)  Agent Pelczar testified that he was neither aggressive, rude, nor demanding and that he never told defendant that he had no choice but to respond to the questions.  (Id. at 70–71.)  In the Motion to Suppress, defendant contends that the questioning by the officers was at times "hostile," but the record does not support this allegation.  (Def.'s Mot. 4.)  No one touched or threatened defendant.  Fourth, at all times, defendant was in his own apartment, which also lessened any sense of coercion.

On the other hand, certain factors weigh against a conclusion that defendant's consent was voluntary.  First, as discussed in Part IV.A, *supra*, defendant was not informed of his right to refuse consent.  (Suppression Hr'g Tr. 117–18, 138, 149.)  He also was not presented with a written consent form, which would have advised him of this right.  (Id. at 116–17.)  In light of defendant's Iranian citizenship and his lack of familiarity with the American criminal justice system, defendant may not have fully understood his constitutional rights, including his right to refuse consent.  Second, the items that the officers seized included defendant's prescription medications and the written prescriptions.  (Id. at 74–75.)  Two business days after the seizure, defendant's counsel called Sergeant Seltzer to request the return of these items because defendant needed his medication.  (Id. at 159, 163.)  Furthermore, the documents that Agent Pelczar testified were all taken from the top of defendant's desk had dates ranging from 1996 to 2005.  (Id. at 128–29.)[3]

---

[3] Defendant argues that the officers' documentation of the events of October 28, 2005 also weighs against a finding of voluntary consent.  (Def.'s Post-Hearing Mem. 8–11.)  Defendant stresses the absence of any mention of the seizures or defendant's consent thereto in the initial FBI Form 302 completed by Agent Pelczar on November 1, 2005.  Defendant describes subsequent statements that he consented as "*post hoc* attempts to 'document' [the] claim of consent to the October 28th seizure."  (Id. at 8.)  Agent Pelczar explained the delay in creating the inventory as follows:  "We wanted to document the high number of prescription medications that [defendant] gave us and I anticipated providing a list of those medications to a

Weighing these factors, the Court concludes, based on the totality of the circumstances, that defendant's consent was voluntary. Defendant argues that it is incongruous that he would have consented to the officers' taking his medications, his passports, and his records. The evidence of consent on the record is substantial and credible, but there is no evidence as to why defendant consented. On that issue, defendant argues that he was not instructed that he could refuse consent, but under Schneckloth and its progeny, that is not required. This lack of knowledge, however, is a possible explanation of why defendant consented—he might have believed that he could not say no. As any such belief was not engendered by any action or threat by the officers, however, it does not vitiate consent.

Defendant relies on United States v. Wein, No. 05-CR-317, 2006 WL 2128155, at *4 (W.D. Pa. July 27, 2006), in which the court held that the defendant's consent was involuntary because "he was so fearful that he felt that he had no choice but to cooperate." This fear, however, was created by the agents who told the defendant the following:

> [E]ither [he] could let them into [his] home and cooperate with them, or they would go [d]owntown, get a warrant, come back to [his] house, knock down [his] door, with their FBI jackets, with their lights flashing and sirens blazing, and they would drag [him] out of [his] house in handcuffs and leg irons, in front of [his] neighbors, in the middle of the day.

Id. at *1 (internal quotation marks & citation omitted). No equivalent intimidation occurred in the instant case. Defendant's consent was a product of his free will and not of a coercive show of authority by the officers.

---

DEA diversion agent to find out if any of them were controlled or had any issues that they saw. I did not feel it was necessary to give the DEA the specific notes about or written report about our interaction with [defendant] in the living room, pertaining to our asking about his exporting business." (Suppression Hr'g Tr. 135–36.) Counting the medications and preparing the report "took an entire morning." (Id. at 136.) The Court finds this explanation credible.

In sum, whether consent was "'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227.  Weighing the factors for and against voluntariness, the Court concludes that the totality of the circumstances supports a finding of voluntary consent.  Defendant's consent was voluntary notwithstanding the fact that he was not informed of his right to refuse consent.  Accordingly, the seizure of items from defendant's apartment on October 28, 2005 was consensual and did not violate defendant's Fourth Amendment rights.  The Court will not suppress any of the evidence seized from defendant's apartment on October 28, 2005.  As these seizures were lawful, the use of this information to obtain a search warrant was proper, and the Court will not suppress the evidence seized pursuant to that warrant on December 13, 2005.  Furthermore, there is no ground to suppress any evidence acquired as the "fruit" of the documents and other information seized on October 28, 2005 and December 13, 2005.

**V.    CONCLUSION**

For all of the foregoing reasons, Defendant Mohammad Reza Vaghari's Motion to Suppress Documents and Other Evidence Seized by the FBI from His Residence is denied.